```
         IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEBRASKA
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:08CR3001 |
| | ) | |
| v. | ) | |
| | ) | |
| RENE MANUEL VARGAS-MIRANDA, | ) | REPORT, RECOMMENDATION |
| SANTIAGO LOPEZ-MENDOZA, | ) | AND ORDER |
| | ) | |
| Defendants. | ) | |

The defendants have filed motions to suppress all evidence obtained as a result of their detention and the subsequent search of their vehicle on December 29, 2007. Filings 28 & 30. The detentions and vehicle search at issue did not arise from a traffic stop. Rather, the vehicle was parked in a Shell gas station parking lot located off of Interstate 80, at Exit 379, in Seward County, Nebraska. Seward County Deputy Sheriff Randy Brown contacted defendant Vargas-Miranda, the operator of the vehicle, inside the gas station, and he contacted defendant Lopez-Mendoza, the vehicle passenger, while he was seated in the vehicle's back seat.

The defendants claim they were illegally detained and questioned by Deputy Sheriff Brown, and the vehicle was unlawfully searched without a warrant, probable cause, or the defendants' consent. For the reasons discussed below, the defendants' motions to suppress should be denied.

                       FINDINGS OF FACT

At approximately 8:30 a.m. on December 29, 2007, Deputy Sheriff Brown was inside a Shell gas station convenience store (the "Speedee Mart") located north of Interstate 80 at exit 379

in Seward County, Nebraska.  Deputy Sheriff Brown has been an officer for the Seward County Sheriff's Department for seven years, and has received basic law enforcement training and additional training in drug identification and interdiction, including instruction on the methods used to package, conceal, and transport illegal contraband.  He is a canine officer and has been involved in 25-30 past drug interdiction stops, approximately one-half of which involved transport of illegal drugs in concealed compartments.  During his contacts with the defendants, Deputy Sheriff Brown was in uniform and visibly armed with his service weapon.

   Interstate 80, Exit 379 provides access to Nebraska Highway 15, a north/south roadway that leads to Seward, Nebraska north of the interstate.  The Speedee Mart was located in the northeast quadrant of the intersection of Interstate 80 and Highway 15, and the officer's patrol vehicle was parked on the west side of the Speedee Mart in one of the parking stalls toward the north side of that store.

   Deputy Sheriff Brown was standing inside the Speedee Mart looking out the window when he noticed a blue Dodge Magnum with New York license plates turn off Highway 15 onto the Speedee Mart driveway, and then stop and back up onto Highway 15 before again proceeding forward and parking on the south side of the store. The driver, later identified as Vargas-Miranda, exited the vehicle and proceeded into the station and toward the coffee machines.  When Vargas-Miranda entered the store, Deputy Sheriff Brown was standing behind the store counter close to a station attendant.  Vargas-Miranda was advised by another station attendant that the coffee was still brewing and would be ready soon.

The defendant then approached the counter and participated in a two or three minute conversation with Deputy Sheriff Brown and the station attendant.  Deputy Sheriff Brown asked Vargas-Miranda where he was coming from and where he was going.  Vargas-Miranda responded that he was traveling to New York to visit his girlfriend, and planned to be there for two or three weeks.  Vargas-Miranda asked Deputy Sheriff Brown if the sheriff's office had Dodge Chargers in its fleet.  When Deputy Sheriff Brown responded, "Yes," Vargas-Miranda explained that he liked that vehicle.  Vargas-Miranda further stated that the vehicle he was currently driving belonged to his girlfriend.  The communications between Vargas-Miranda, the officer, and the station attendant were in English, and the defendant did not appear to have any difficulty conversing in English.

The weather was cold that day, approximately 14 to 17 degrees Fahrenheit.  Deputy Sheriff Brown had left his canine in his patrol vehicle with the vehicle's heater running on high.  He exited the station, spent two or three minutes at his vehicle checking on his canine, and began to re-enter the Speedee Mart.  When he reached the wind shield and awning for the station's doorway, he met Vargas-Miranda who was leaving the store.

Deputy Sheriff Brown again spoke with the Vargas-Miranda in English.  Deputy Sheriff Brown asked if he could see the defendant's drivers license.  Vargas-Miranda complied by retrieving a California driver's license from a plastic playing card box located in his back pocket.  The officer asked to see the vehicle registration.  Vargas-Miranda did not have vehicle registration documents, but did produce an insurance card.

Deputy Sheriff Brown reviewed the driver's license, contacted dispatch, and requested criminal history information for Vargas-Miranda. He looked at the insurance card and noted it was issued to a female in New York. The officer asked Vargas-Miranda how he intended to return to California from New York. Vargas-Miranda stated he would probably rent a car. Deputy Sheriff Brown was holding the insurance card with his thumb covering the vehicle owner's name. When he asked Vargas-Miranda for the name of the owner, the defendant tried to look at the card to read the name. Vargas-Miranda then stated the vehicle belonged to the passenger's girlfriend and provided only her first name. His voice was shaking and he appeared nervous. Deputy Sheriff Brown asked for the name of the passenger, and Vargas-Miranda responded, "Santiago."

Deputy Sheriff Brown approached the Dodge Magnum to speak with the passenger located in the vehicle's back seat. Vargas-Miranda had provided inconsistent information on who owned the vehicle, and the officer wanted to confirm that the vehicle was not stolen. Deputy Sheriff Brown approached the rear passenger door and knocked on the window. The passenger, later identified as Lopez-Mendoza, opened the door. The officer noticed an overwhelming odor of air freshener emanating from the vehicle. Over the course of his contact with Lopez-Mendoza, the officer saw a total of seven or eight air fresheners inside the vehicle; a Christmas Tree air freshener in the back seat, a Wick air freshener can on the vehicle floor, two or three air fresheners hanging from the steering column, and two or three air fresheners in the back seat area of the vehicle. Based on his training and experience in drug interdiction, Deputy Sheriff Brown knew air fresheners were often used to mask the odor of illegal drugs.

Deputy Sheriff Brown spoke with Lopez-Mendoza in English. Although Lopez-Mendoza could not speak English fluently, he was able to provide responsive answers to the officer's short and specific questions.  In response to the officer's questions, Lopez-Mendoza stated the vehicle belonged to Jessica Roldan, the name appearing on the insurance card.  Although Lopez-Mendoza did not state what his relationship was with Jessica Roldan, based on the information provided by Lopez-Mendoza, Deputy Sheriff Brown did not believe the vehicle was stolen.  Lopez-Mendoza stated he and Vargas-Miranda were traveling to New York from California to visit a friend, intended to stay there two or three days, and would then fly back to California.

At this point in the conversation, Vargas-Miranda had arrived at the Dodge Magnum's driver's side door.  He yelled over to Deputy Sheriff Brown that Lopez-Mendoza could not speak English.  Lopez-Mendoza then advised the officer that he could not speak English.

The officer's patrol vehicle was not facing the Dodge Magnum, and therefore the officer's encounter with the defendants by their vehicle could not be visually captured on the patrol vehicle's in-car camera.  However, before pursuing any further communication, Deputy Sheriff Brown manually activated his in-car camera to audio-record his conversation with Vargas-Miranda.  See ex. 1.  Shortly thereafter, Deputy Sheriff Brown was advised that Vargas-Miranda did not have a criminal history and was not the subject of any outstanding warrants.

Deputy Sheriff Brown walked toward the back of the Dodge Magnum, met with Vargas-Miranda, and returned all the documents that had been produced.  Deputy Sheriff Brown stated, "I

appreciate you talking to me.  I appreciate it.  You understand it's consensual right?  You talking to me?"  Ex. 1, 1:49-2:01. Vargas-Miranda affirmed that he understood it was consensual. Approximately ten minutes had elapsed since the defendants entered the Speedee Mart parking lot.

    Deputy Sheriff Brown then asked if Vargas-Miranda had any drugs, or any marijuana in the vehicle.  Vargas-Miranda responded, "No" to both questions.  When asked if he had any heroin, Vargas-Miranda laughed and stated he left it at home.  He also denied possessing any cocaine.  Deputy Sheriff Brown asked, "You care if I look and see?," simultaneously gesturing this request by pointing two fingers first toward his eyes and then at the Dodge Magnum.  Vargas-Miranda responded, "Go ahead," but added "you don't got no right" because "I wasn't even driving." Deputy Sheriff Brown responded, "Well I'm asking you.  I'm just asking you.  I'm asking you.  But like you said, it's all consensual.  I'm just asking you."  Ex. 1, 2:30-2:48.  Vargas-Miranda, standing with his arms folded, nodded his head.

    Vargas-Miranda was dressed in baggy jeans and a pullover sweatshirt, and was wearing a baseball cap and sunglasses.  He was asked to lift his shirt so the officer could look for weapons.  Vargas-Miranda complied, and was then told to stand in front of the Dodge Magnum on the passenger side near a picnic table.  Vargas-Miranda was told that since he consented to the search, the officer was going to quickly search the vehicle.

    Deputy Sheriff Brown then spoke with Lopez-Mendoza in English and asked if there were any drugs in the vehicle.  Lopez-Mendoza appeared to understand the officer and responded, "nothing."  The officer told Lopez-Mendoza that Vargas-Miranda

6

had consented to a vehicle search, and the vehicle was going to be searched.  He asked Lopez-Mendoza to stand by Vargas-Miranda.  Lopez-Mendoza complied.

Prior to beginning the search, Deputy Sheriff Brown was aware that Vargas-Miranda had no criminal history.  He did not advise the defendants of their <u>Miranda</u> rights, or tell them they were free to leave or could refuse to consent to a search.

Deputy Sheriff Brown called for backup assistance.  Deputy Sheriff Down of the Seward County Sheriff's department arrived five or ten minutes later and placed the defendants in his vehicle while the Dodge Magnum was searched.

After calling for backup, Deputy Sheriff Brown drove his patrol vehicle behind the Dodge Magnum so he could video-record the search and retrieve his canine.  The canine ran around the defendants' vehicle but did not alert to the odor of drugs.  The canine was returned to the patrol vehicle, and the officer began to manually search the rear cargo area of the Dodge Magnum.

Deputy Sheriff Brown noticed that the screws used to attach the rear side panels were inconsistent with one another, and some of the screws appeared to be drywall screws.  The officer believed these screws were not installed by the vehicle manufacturer.  The officer concentrated his search on this area and removed the screws and side panels with a cordless drill.  Although the voids behind the side panels were empty, it was visibly apparent that post-manufacture alterations were made to widen the access to the cavities behind these panels.  The screws had been easily removed, and they were easily reset, with no damage to the vehicle.  Based on his training and experience,

7

Deputy Sheriff Brown believed the modifications he saw behind the rear panels were made to facilitate storing and concealing illegal drugs during transport.

Deputy Sheriff Brown searched the front seat area of the vehicle.  When he removed the glove box, he noticed one of the rivets used to affix the manufacturer-installed carpet behind the glove box was missing.  The officer removed the remaining rivet and looked up into the air bag area.  Although the officer believed a vehicle of this make, model, and year would have been sold equipped with a passenger-side air bag, this air bag was missing.  Deputy Sheriff Brown removed the front dash panel which framed out the heater and console, and looking toward the glove box, saw a cylindrical object wrapped in black electrical tape.

Deputy Sheriff Brown retrieved his canine to perform another drug sniff.  The canine entered the vehicle, exhibited significant behavior changes, and began scratching and biting at the floor board, thereby indicating to the odor of drugs inside the vehicle.  Deputy Sheriff Brown removed the cylindrical package found in the front console area.  The vehicle was towed from the scene.

## LEGAL ANALYSIS

The defendants claim they were unlawfully seized and questioned by Deputy Sheriff Brown, and that the vehicle they occupied was unlawfully searched.

A.   <u>Unlawful Seizure</u>.

Vargas-Miranda does not claim his initial contact with Deputy Sheriff Brown was an unlawful "seizure" in violation of

the Fourth Amendment, readily admitting that "initially the encounter between Vargas-Miranda and Brown was consensual. . . ." Filing 29, p. 6.  Vargas-Miranda claims "it quickly turned into an illegal investigatory detention when Brown took Vargas-Miranda's driver's license and insurance card," because "[o]nce this show of authority occurred, Vargas-Miranda did not feel free to leave."  Filing 29, p. 6.  Lopez-Mendoza claims he was unlawfully seized when Deputy Sheriff Brown requested consent to search the vehicle, asked the defendants to stand away from it, pulled his patrol car behind the defendants' car, and called for a back up officer.  Filing 31, p. 4.

    1.   Request for driver's license and vehicle registration.

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194 (2002). However, a consensual encounter between citizens and police may become an unlawful seizure if, during the course of events, "it loses its consensual nature." U.S. v. Carpenter, 462 F.3d 981, 985 (8th Cir. 2006)(quoting Bostick, 501 U.S. at 434).

Vargas-Miranda argues that his encounter with Deputy Sheriff Brown became an unlawful seizure when the officer asked the defendant to produce his drivers license and vehicle registration.  "Even when officers have no basis for suspecting a particular individual, they may generally ask the individual questions and request to examine his or her identification." Bostick, 501 U.S. at 435.  An officer does not "seize" a person by asking to see his or her driver's license and vehicle

registration provided he does not "convey a message that compliance with [his] request is required." U.S. v. Carpenter, 462 F.3d at 985 (reversing district court's ruling suppressing evidence and holding that no seizure occurred when an officer approached a vehicle stopped on the side of the road, asked the driver for his license and vehicle registration, and retained these documents for four or five minutes to examine them).

Vargas-Miranda claims he was acceding to the officer's authority and did not freely and voluntarily produce his license and the vehicle insurance card in response to the officer's request.  He argues he did not believe he was free to ignore the officer, walk away, and continue on with his travel.

In determining whether a seizure has occurred, the proper inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter. Drayton, 536 U.S. at 202.  The reasonable person test is objective and is based upon whether an innocent person in the position of the defendant would have felt compelled to speak with the officer, answer his questions, and cooperate with his requests for information and documents.  Id.

Deputy Sheriff Brown did not order Vargas-Miranda to provide information. He asked.  Although the officer did not advise Vargas-Miranda of his right to refuse to cooperate, the failure to provide this information does not establish that a seizure occurred.  Drayton, 536 U.S. at 207.  Deputy Sheriff Brown was in uniform and armed, but "those factors should have little weight" in determining if an encounter with law enforcement is consensual.  Drayton, 536 U.S. at 204.

10

> Officers are often required to wear uniforms and in many circumstances this is cause for assurance, not discomfort. Much the same can be said for wearing sidearms. That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.

Id.

Deputy Sheriff Brown did not apply force use intimidating movements or threats, command Vargas-Miranda's compliance, brandish his weapon, or stop Vargas-Miranda's movements to obtain Vargas-Miranda's cooperation. Drayton, 536 U.S. at 204. The incident occurred in a public place in the daytime, with convenience store employees nearby. The officer's marked vehicle was in plain sight when the defendants chose to enter the Speedee Mart parking lot, and when Vargas-Miranda chose to enter the store. Vargas-Miranda chose to approach the officer and begin a conversation. Under the totality of these circumstances, a reasonable person in Vargas-Miranda's position would have believed he was free to refuse the officer's requests for information and continue on with his travel, and a reasonable officer would believe this defendant was voluntarily cooperating with the officer's requests. Vargas-Miranda was not unlawfully seized when he responded to Deputy Sheriff Brown's request to produce his drivers license and the vehicle information. U.S. v. Locklin, 943 F.2d 838 (8th Cir. 1991)(reversing district court's ruling suppressing evidence and holding that the presence of a marked police car and use of police car's computer to check person's name did not transform a consensual encounter into "seizure" where the incident occurred on public sidewalk, detectives made no demand, gave no intimidating commands, displayed no weapons, and used neither threats nor force). See

11

also, United States v. Granillo, 288 F.3d 1071 (8th Cir. 2002)(holding that "asking defendant for identification" was not a seizure absent evidence that the officer "used language or a tone of voice indicating that compliance might be compelled").

    2.   Retaining driver's license pending criminal history check.

After receiving Vargas-Miranda's driver's license and a vehicle insurance card, Deputy Sheriff Brown called dispatch to perform a criminal history check on Vargas-Miranda. The officer did not "seize" Vargas-Miranda by briefly retaining his license while awaiting a response from dispatch. Once the drivers license is produced, an officer can reasonably interpret the person's act of providing this document as consent to retain it for a brief examination or check. Carpenter, 462 F.3d 981, 985.

    3.   Investigatory detention.

Lopez-Mendoza argues he was unlawfully seized when Deputy Sheriff Brown asked for consent to search the vehicle, called for backup assistance, parked his patrol vehicle behind the Dodge Magnum, and directed the defendants to stand outside the vehicle while the search was performed. A law enforcement officer may ask for consent to search even in the absence of reasonable suspicion, and doing does not result in a "seizure" unless the officer secures the defendant's cooperation by coercive means. Drayton, 536 U.S. at 201. As more thoroughly discussed below, Deputy Sheriff Brown did not coerce Vargas-Miranda to consent to a search of the Dodge Magnum.

Moreover, at the time the officer asked for consent to search, he had made observations and heard statements that

aroused his suspicion that criminal activity was afoot. Before receiving any information from dispatch, Deputy Sheriff Brown reviewed the insurance card and asked Vargas-Miranda to state the name of the vehicle owner. Vargas-Miranda appeared very nervous and was shaking. He tried to read the insurance card, and could state the first but not the last name of the vehicle owner, although he had earlier stated the owner was his girlfriend. This inconsistency and Vargas-Miranda's demeanor prompted the officer to reasonably suspect the vehicle may be stolen, justifying the officer's further investigation and his questioning of the passenger, Lopez-Mendoza.

The conversation with Lopez-Mendoza dispelled the officer's concern that the vehicle may be stolen, but revealed additional information and prompted further suspicion that illegal activity was occurring, likely illegal drug activity. While speaking with Lopez-Mendoza who was seated in the Dodge Magnum, Deputy Sheriff Brown smelled the strong odor of air freshener, which is often used to mask the odor of illegal drugs, and he saw seven or eight air fresheners in the vehicle. In addition, Lopez-Mendoza's description of the travel itinerary was not consistent with Vargas-Miranda's. Lopez-Mendoza stated they were visiting a friend in New York for two or three days and returning home by airplane, while Vargas-Miranda stated they were visiting his girlfriend in New York for two or three weeks and probably returning home by rental car. Moreover, when Vargas-Miranda saw Lopez-Mendoza speaking with the officer, he yelled that Lopez-Mendoza could not speak English. Lopez-Mendoza, who had been communicating with the officer in English, promptly stopped the conversation by stating he was unable to speak English.

"In evaluating whether a set of facts would give rise to reasonable suspicion, this court must look at the totality of the circumstances and not just each independent fact standing alone. Furthermore, the court may consider any added meaning that certain conduct might suggest to experienced officers in the field, trained in the observation of criminal activity." United States v. Jones, 269 F.3d 919, 926-927 (8th Cir. 2001). Based on the totality of facts discovered by Deputy Sheriff Brown during this consensual encounter, I conclude the officer had a reasonable articulable suspicion to continue detaining the defendants for a reasonable period of time to investigate the circumstances and determine if the defendants were engaged in criminal activity. United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000)(holding presence of a masking odor in vehicle, passenger's nervous behavior, passenger's inability to recall the name of his purported daughter-in-law, and vast divergence between passenger's and driver's statements regarding travel accommodations to California justified further detention of the vehicle for investigation of whether a crime was being committed). See also, Jones, 269 F.3d at 928 (holding inconsistent information on travel plans "casts suspicion and doubt on the nature and legitimacy" of defendants' activity); United States v. Pulliam, 265 F.3d 736, 740 (8th Cir. 2001)(inconsistencies in information regarding the trip and the relationship between the driver and passenger justified further detention of the driver while the officer continued to investigate).

The defendants were not unlawfully seized when Deputy Sheriff Brown asked Vargas-Miranda for his license and the vehicle registration, asked for consent to search the vehicle, and directed the defendants to stand outside the Dodge Magnum

while the officer parked a patrol car behind it and conducted a search pursuant to Vargas-Miranda's voluntary consent.

    B.   <u>Consent to Search</u>.

The defendants claim Vargas-Miranda did not voluntarily consent to the vehicle search, and even if he did, the search performed exceeded the scope of the consent given. The precise question is not whether Vargas-Miranda consented subjectively to Deputy Sheriff Brown's search of the Dodge Magnum, nor whether the officer actually believed he consented, but rather whether a reasonable officer under the circumstances would believe Vargas-Miranda provided a valid consent. <u>United States v. Jones</u>, 254 F.3d 692, 695 (8th Cir. 2001); <u>United States v. Sanchez</u>, 156 F.3d 875, 878 (8th Cir. 1998). See also <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 188 (1990). The defendant's "actual subjective state of mind at the time that he allegedly gave his consent is not determinative; our focus, rather, is on how a reasonable person could have perceived his state of mind at that time." <u>United States v. Cedano-Medina</u>, 366 F.3d 682, 685 (8th Cir. 2004). The government has the burden of proving by a preponderance of the evidence that Vargas-Miranda actually consented to the search of the vehicle or that a reasonable officer in Deputy Sheriff Brown's position would believe that he did. <u>Jones</u>, 254 F.3d at 695; <u>United States v. Miller</u>, 20 F.3d 926, 930 (8th Cir. 1994).

The government need not prove that both Vargas-Miranda, the driver, and Lopez-Mendoza, the passenger, consented to the search. Neither defendant owned the Dodge Magnum.

> It is . . . well settled that consent to a search may be given not only by the owner of the property to be searched but also by a third party who possesses common

> authority over or other sufficient relationship to the
> premises sought to be inspected.  The driver of a car
> has the authority to consent to a search of that
> vehicle.  As the driver, he is the person having
> immediate possession of and control over the vehicle.
> The driver may consent to a full search of the vehicle,
> including its trunk, glove box and other components.
> This is true even when some other person who also has
> control over the car is present, if the other person
> remains silent when the driver consents and does not
> object to the search.

U.S. v. Eldridge, 984 F.2d 943, 948 (8th Cir. 1993)(citing United States v. Matlock, 415 U.S. 164, 171 (1974)(internal citations and quotation marks omitted).

The Eighth Circuit has summarized the analysis required in determining if a defendant voluntarily consented to a search.

> A court determines whether consent is voluntary under
> the totality of the circumstances. . . .  In evaluating
> the reasonableness of the officer's belief [that the
> search was consensual], we consider the characteristics
> of the person consenting, including the party's age,
> intelligence and education, whether he was under the
> influence of drugs or alcohol, whether he was informed
> of his right to withhold consent, and whether he was
> aware of rights afforded criminal suspects.  We also
> consider the environment in which the alleged consent
> took place, specifically (1) the length of time he was
> detained; (2) whether the police threatened, physically
> intimidated, or punished him; (3) whether the police
> made promises or misrepresentations; (4) whether he was
> in custody or under arrest when the consent was given;
> (5) whether the consent occurred in a public or a
> secluded place; and (6) whether he stood by silently as
> the search occurred.

United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005)(internal citations omitted).  See also United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003).

Vargas-Miranda is an adult, and was able to freely converse with the officer in English.  The encounter between Vargas-Miranda and Deputy Sheriff Brown was consensual from the outset.  Vargas-Miranda was not intimidated by law enforcement or this officer.  Rather, he entered the Speedee Mart despite the presence of an unoccupied sheriff's vehicle in the parking lot, started a conversation with the uniformed and visibly armed officer while waiting for coffee to brew, and in response to the officer's later questioning, jokingly stated he had heroin at home but not in his vehicle.  Before requesting consent, the officer stated Vargas-Miranda that their conversation was consensual.  Vargas-Miranda responded, "Go ahead," but nonetheless pointed out that the officer had "no right" to conduct the search.  Deputy Sheriff Brown repeated that their communications were consensual, and stated that he was "just asking" for consent to search the vehicle.  The exchange occurred in a public place.

Deputy Sheriff Brown did not promise or misrepresent anything, and made no threats to secure Vargas-Miranda's further cooperation or his consent.  The officer merely asked if there were any drugs in the vehicle, and when Vargas-Miranda denied possession of drugs, asked, "You care if I look and see?," his accompanying hand gestures further conveying the meaning of his question.  Vargas-Miranda was not under arrest.  His drivers licence and the vehicle insurance card had been returned.  Vargas-Miranda and Lopez-Mendoza watched the search and neither defendant asked or indicated that the search should be stopped.

Under the totality of these circumstances, I conclude Vargas-Miranda voluntarily consented to the search of the Dodge Magnum.  See e.g., <u>United States v. Carrate</u>, 122 F.3d 666, 670

17

(8th Cir. 1997)(holding the defendant voluntarily consented to the search where, despite his limited ability to speak English and the trooper's failure to use a written consent form or advise the defendant of his right to refuse consent, the defendant understood and appropriately answered the trooper's questions, had been detained for only a short amount of time before consenting, was not threatened or physically intimidated and no promises or misrepresentations were made, was not under arrest when he consented, was on a public interstate; and he stood idly by while the troopers searched his car, never indicating that he objected to the search.)

Although Vargas-Miranda claims he withdrew his consent by stating the officer had no right to search the vehicle, this statement cannot be construed as an "unequivocal act or statement of withdrawal," especially considering the Vargas-Miranda thereafter watched the search and raised no objection. U.S. v. Martel-Martines, 988 F.2d 855, 858 (8th Cir. 1993)(holding defendant's act of watching in silence as the officers examined his truck on a hoist, lowered it, and prepared to puncture the sheet metal that covered the secret compartment defeated any claim that he withdrew his consent or believed the search exceeded the scope of his consent).

Lopez-Mendoza argues that even if Vargas-Miranda's consent to search was voluntary, the scope of the consent was limited to "looking inside," which does not permit dismantling portions of the vehicle.  "The scope of a search is generally defined by its expressed object."  Florida v. Jimeno, 500 U.S. 248, 251 (1991).  Deputy Sheriff Brown asked Vargas-Miranda if there were illegal drugs in the vehicle, and followed these questions by asking, "You care if I look and see?"  Considered in context, the officer

was asking for consent to look for illegal drugs in the vehicle, and "it was objectively reasonable for the police to conclude that the general consent to search [defendant's] car included consent to search containers within that car which might bear drugs."  Jimeno, 500 U.S. at 251.

Lopez-Mendoza argues that dismantling portions of the Dodge Magnum to inspect concealed areas exceeded the scope of any consent to search the vehicle.  "Although an individual consenting to a vehicle search should expect that search to be thorough, he need not anticipate that the search will involve the destruction of his vehicle, its parts or contents."  U.S. v. Alverez, 235 F.3d 1086, 1088-89 (8th Cir. 2000).

However, there is a distinction between damaging a vehicle and dismantling a vehicle.  There is no evidence that Deputy Sheriff Brown's search damaged any part of the Dodge Magnum.  At the outset of the consent search, Deputy Sheriff Brown noticed what appeared to be after-market alterations in the rear cargo area; specifically, drywall screws used to attach the rear side panels.  He removed these screws, and found evidence that the vehicle was likely used to transport drugs in the past, though no illegal drugs were currently present.  The officer then replaced the screws without damaging the vehicle, and proceeded to remove the glove box and front dashboard area.  Dismantling the vehicle in this manner to expose its concealed compartments did not exceed the scope of the Vargas-Miranda's consent the vehicle for illegal drugs.  U.S. v. Ferrer-Montoya, 483 F.3d 565, 568 (8th Cir. 2007)(holding officer's act of removing screws from vehicle to open a concealed compartment commonly used for drug transport was minimally intrusive, did no damage to the vehicle, and did not exceed the defendant's consent to search); U.S. v. Alcantar,

19

271 F.3d 731, 735 (8th Cir. 2001)(holding consent to search truck for guns and drugs permitted two-hour and forty-five minute search during which "the officers removed and inspected pieces of the truck, used a fiber optic scope to search the gas tank, air conditioning vents, fenders and other hidden areas of the truck, climbed under the truck with a flashlight, pulled apart the door and interior fabric panels, and used a stethoscope").

Deputy Sheriff Brown's search of the Dodge Magnum did not violate the defendants' Fourth Amendment rights. The defendants' motion to suppress the evidence found during the search should be denied.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, that the motions to suppress, filings 28 and 30, be denied in all respects.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

IT FURTHER HEREBY IS ORDERED:  Trial is set to commence at 9:00 a.m. on June 30, 2008, for a duration of three trial days before the Honorable Richard G. Kopf in Courtroom 1, United States Courthouse and Federal Building, 100 Centennial Mall North, Lincoln, Nebraska. Jury selection will be at the commencement of trial.

DATED this 12th day of May, 2008.

BY THE COURT:

s/ *David L. Piester*
David L. Piester
United States Magistrate Judge